# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DOUG and MIKA RACE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-01437** |
| | ) | **Judge Aleta A. Trauger** |
| **MICHAEL GAULT, ESQ., MICHAEL N.** | ) | |
| **WENNERLUND, ESQ., and BELL** | ) | |
| **CARRINGTON PRICE and GREGG,** | ) | |
| **LLC and JACOB GRIEFER, ESQ.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

The court has diversity jurisdiction over this legal malpractice action stemming from the defendants' representation of plaintiffs Mika and Doug Race in a Petition for Condemnation filed by the City of Pigeon Forge, Tennessee, Case No. 24-CV-19-IV, in the Circuit Court for Sevier County, Tennessee (the "Underlying Case"). The defendants include attorneys Michael Gault, Michael Wennerlund, and Jacob Griefer,[1] as well as the law firm of Bell Carrington Price & Gregg LLC. Now before the court is the defendants' Motion for Summary Judgment. (Doc. No. 43.) For the reasons set forth herein, the motion will be granted.

## I.      LEGAL STANDARD – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P.

---

[1] Jacob Griefer is not identified in the Complaint (Doc. No. 1) and does not appear to have had any role in representing the plaintiffs in the Underlying Case. The reason for his presence in this case is entirely unclear.

56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving

party].ௗ *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II. FACTS[2] AND PROCEDURAL HISTORY

Plaintiffs Mika and Doug Race, who are citizens of Chillicothe, Ohio (*see* Doc. No. 43-6, M. Race Dep. 10), purchased a 0.36-acre property located at 362 Ogle Drive, Pigeon Forge, Tennessee (the "Property") for $306,000 in August 2022. They intended to use it primarily as an investment property as well as for family vacations. (*Id.* at 21.) They spent months and a substantial amount of money renovating the Property. (*Id.* at 27–29.)

Prior to their purchase, in November 2021, and despite prior public input in favor of a different route, the City of Pigeon Forge ("City") approved a route for the Westside Connector Phase 2, that impacted the Property. (SUMF ¶ 2; City Council Meeting Minutes, Nov. 22, 2021 Meeting, Doc. No. 43-2 at 10.)[3] The plaintiffs purport to dispute this statement as relying on "notes" rather than official minutes and by referring to events that predated such approval (*see* RSUMF ¶ 2), none of which is sufficient to refute the fact that the City approved the route for the Westside Connector in late 2021 and that the final route impacted the Property.

What the plaintiffs clearly dispute is the propriety of the selection of the final route. They point to evidence in the record suggesting that the City did not select the route overwhelmingly preferred by community members who attended a meeting on October 26, 2021 to discuss three

---

[2] The facts set forth herein are drawn from the defendants' Statement of Undisputed Material Facts ("SUMF") (Doc. No. 45), the plaintiff's Response to the SUMF ("RSUMF") (Doc. No. 51), and the evidence cited by both parties in support of their positions. The facts are viewed in the light most favorable to the plaintiffs unless otherwise indicated. The facts for which no citation is provided are undisputed, at least for purposes of the defendants' motion.

[3] The Westside Connector is "a roadway that would allow residents and business owners of Pigeon Forge to by-pass the heavily trafficked [State Route 77/US 441]." (Doc. No. 43-18, Conway Report 1.)

alternative routes. (*See* Doc. No. 51-5.) Instead, according to the plaintiffs, the City surreptitiously altered the route to avoid having it impact a campground partially owned by City Mayor David Wear, and it employed Jeff Mize of CDM Smith to redesign the route for the Westside Connector to avoid the campground and to design a bridge that would benefit only the campground. (RSUMF ¶ 2 (citing Doc. Nos. 51-4, 51-5, 51-6, 51-7).)

In any event, for reasons that have never been made clear, the Races were unaware when they purchased the Property that "their home was to be torn down for a road to come through." (Doc. No. 1, Compl. ¶ 13.) They first learned on March 6, 2023 that the Property was potentially going to be subject to a condemnation action. (M. Race Dep. 29.) Shortly thereafter, they went to City Hall to attempt to find out more; they ended up meeting with Assistant City Manager Eric Brackins, who confirmed that the Property would be subject to eminent domain and that "negotiations were going to start any day." (*Id.* at 32, 35.) Following that meeting, the Races had "multiple" conversations with Brackins and another meeting with Brackins and other city officials on March 22, 2023, hoping to "get [the City] to move the road back where it originally was going." (*Id.* at 36.) Following that meeting, the plaintiffs sent an email to Eric Brackins on March 22, 2023, stating that it "would be in [their] best interest if the phase of the road impacting [the Property] was not delayed" and that the Races "would much rather get on beyond this to start a future rental home here." (Doc. No. 43-3.)

At some point after that meeting in March 2023, the plaintiffs were contacted by a negotiator from the City. (M. Race Dep. 39.) On October 16, 2023, the plaintiffs sent a letter to the City rejecting the offer of $490,000 as compensation for the Property and counteroffering a settlement of $3,000,000. (Doc. No. 43-4.) The plaintiffs were later told that the City would approve a ten percent increase, to $539,000, to settle the acquisition, which the plaintiffs rejected,

stating that $1,5000,000 after taxes was the lowest amount they would accept. (M. Race Dep. 53, 55.)

On January 12, 2024, the City filed a Petition for Condemnation for condemnation of the Property, thus initiating the Underlying Case. The plaintiffs contacted defendant Michael Gault, an attorney with the South Carolina law firm of Bell Carrington Price & Gregg ("Bell Carrington"), also a defendant,[4] which advertised itself as specializing in eminent domain. (*Id.* at 57.) During their first telephone conversation with Gault, the plaintiffs "told him everything," including that they had learned that the Mayor David Wear had a conflict of interest and that the road had been inappropriately rerouted. (*Id.* at 57–58.) Gault told them, "you cannot fight eminent domain and even if you could, your pockets aren't deep enough." (*Id.* at 57.) He also told them, regarding the mayor's conflict of interest, that they could use that information as "leverage" to get "a better just compensation" for their Property. (*Id.* at 58.)

According to Mika Race, that did not "sound agreeable" to her because she "wanted to fight for [her] property." (*Id.*) She hired Gault anyway, "[b]ecause [she] though he would fight for [her] property." (*Id.* at 58–59.) She confirmed that, "even though he told [her] that you can't fight eminent domain and [her] pockets aren't deep enough" and "even though he told [her] that" all of the information she had given him about the mayor's conflict of interest "would be leverage for better just compensation," she "still thought he would be fighting to keep [her] property." (*Id.* at 59.) Her belief was based on the fact that she and her husband told him they wanted to keep the Property and that Gault "wanted to see all the documentation" and never suggested that they find

---

[4] Defendant Michael Wennerlund, another lawyer sued individually, is an attorney licensed to practice law in Tennessee and a resident of Nashville. (Compl. ¶ 3; Doc. No. 7, Answer ¶ 3.) Wennerlund was apparently local counsel for the plaintiffs in the Underlying Case. (*See* Doc. No. 46-2, Gault Dep. 41–42.)

other legal counsel. (*Id.* at 63.) After they sent him all the documentation of alleged improper machinations, Gault never told them that they "had an opportunity to keep [their] property." (*Id.* at 64.)

Following that initial conversation, on February 20, 2024, the Races entered into a Contingency Fee Agreement with Bell Carrington for legal services related to the Underlying Case. (*See* Doc. No. 43-7 at 2.) The Contingency Fee Agreement defined the scope of representation as "representation in Client's eminent domain/land condemnation matter with the Condemning Authority" for the Property. (*Id.* at 1.) The scope of work anticipated by the representation was described as follows:

> Attorney shall perform all reasonable, necessary and usual services in matters of this kind including, but not limited to: review of the Authority's initial offer, investigation of facts, evaluation of subsequent offers, selecting and retaining appraisers, review of appraisals, compiling records of expenses, and negotiations with its representative.
>
> If settlement is not effected which is satisfactory to the Client, Attorney agrees to represent the Client before any initial administrative tribunal, commissioner, mediator, or court regarding the condemnation of Client's property.

(*Id.*)

The Contingency Fee Agreement further stipulated that the law firm's fee for services would be "contingent upon the result obtained." (*Id.*) More specifically, the plaintiffs would not owe any fee "if the final price obtained for the property is not greater than the initial offer of the Condemning Authority." (*Id.*) If the final amount procured for the Property exceeded the initial offer by the City, then the defendants' legal fee was to be 33% of the difference between the City's initial offer and the final amount procured for the Property. (*Id.*) At the time the City filed the Petition for Condemnation, the City had determined that the amount to which the plaintiffs were entitled for the taking of the Property was $490,000. (*See* Doc. No. 43-8, Pipkin Appraisal.)

Gault testified that, in his practice, he only "fight[s] for just compensation; we do not challenge the take." (Doc. No. 46-2, Gault Dep. 16.) He also stated that he "wouldn't take a case where the right to take was in question or wanted to be challenged by the client. (*Id.* at 16–17.) He explained that Bell Carrington is "set upon a contingency [fee] basis" and that the firm "operate[s] only to fight just compensation." (*Id.* at 17.) He specifically recalled telling Mika Race that they "would only do just compensation" and that he "wanted to make it clear early on that [his] role would be singularly to maximize just compensation." (*Id.* at 18.)

To that end, he "look[ed] into evidence of whether there was a conflict of interest between the campground and the condemnation" of the Races' Property, because that was a "major part of [their] early conversations," and Gault "expected that to be a major part of [the] case." (*Id.* at 22–23.) His intention was to investigate and bring to light any corruption that may have existed between the City government and the campground in which the mayor owned an interest." (*Id.* at 23; *see also id.* at 49–50 (recalling documents establishing that the mayor and his brother owned the campground).) Gault testified that the fact that the Westside Connector project ultimately did not go through the campground gave him "significant concern," and he believed, then and at the time of his deposition, that corruption could have been involved and that the Races had "fallen sort of victim to an unfortunate situation." (*Id.* at 50.) He intended to use that information to "help maximize just compensation." (*Id.*)

He also testified, regarding the "Public Purpose Doctrine" that pertains in eminent domain cases, that, in his mind, "if it's a road and it's going to be open to the public, . . . it's for a Public Purpose . . . ." (*Id.* at 24; *see also id.* at 25 ("And so when I saw it was a road project, . . . then I determined it was more than likely to be deemed for a public purpose and not one that I was prepared to challenge.").)

On March 29, 2024, Doug Race sent an email to Michael Gault, stating:

> What concerns us is them getting the property without compensating all our debt in the house we're paying on. I know we discussed this yesterday so please forgive us.
> 210k Mortgage outstanding.
> 150k for a HELOC loan toward the home.
> Also, various credit cards we used for, renovation.
> Also the 39k in the mortgage, etc since we found out about the road. So no revenue we could have made because they told us any day for negotiation.
> So it's really not about delaying the taking, it's just getting the debt paid off of the house we will no longer have.

(Doc. No. 43-10.) The plaintiffs do not deny that Doug Race sent this email but insist that it is taken out of context. Although their RSUMF purports to quote the email from Gault to which Doug Race was responding, they have not introduced into the court's record the email chain they purport to quote. In any event, to the extent they characterize the greater context of Doug Race's email as "clarif[ying] that the Races' primary concern was ensuring they received just compensation sufficient to cover the substantial debt incurred on the property" and that they were not "attempting to delay the taking for delay's sake" (RSUMF ¶ 14 at 7, 9) the email quoted above, standing alone, makes that much clear.[5]

On May 6, 2024, an Agreed Order of Possession was entered in the Underlying Case, granting the City property rights and immediate possession of the Property within thirty days, while expressly reserving the issue of just compensation for later adjudication. (Doc. No. 43-11.) Although Mika Race states that she and her husband did not know about the Agreed Order of

---

[5] The remainder of the email exchange does not change that impression. According to the plaintiffs, Doug Race initially asked Gault if the City was doing a "Quick Take" and, if so, whether that meant they should be able to delay the taking since the road was "5 years out." (RSUMF ¶ 14.) Gault purportedly replied that they could "argue that to the judge all day but it is very unlikely that they will delay possession of the property." (*Id.*) Thus, the "best case scenario" was getting the City to agree to an immediate payment of the amount required to pay off any indebtedness while "we argue and negotiate over the rest." (*Id.*) He concluded, "Let me know what you want me to do." (*Id.*) Doug Race responded with the email quoted by the defendants, above.

Possession until they received a copy of it on July 5, 2024 (*see* M. Race Dep. 85–86), she "of course" knew that the City was taking possession of the Property (*id.* at 87), and did take possession of the Property, on May 6, that they had requested thirty days after that to "get [their] stuff out," and that they were out early, by the last weekend of May (*id.* at 86). Her statement regarding lack of knowledge of the Agreed Order is contradicted by the fact that Gault emailed Mika Race on May 6, 2024 to inform her that the "Consent Order has been entered" and that they had "30 days to vacate and to remove any personal property." (Doc. No. 43-12.) Mika Race responded, not with shock to learn that the Consent Order had been entered, but to confirm that they had to vacate within "30 days from today," *i.e.*, from May 6, 2024, and to ask if they could move the shed if they wanted to give it to someone. (*Id.*)

An Agreed Order for Drawdown and Judgment as to Respondent Nationstar Mortgage LLC was entered on July 11, 2024. (Doc. No. 43-13.) Nationstar Mortgage LLC ("Nationstar") was the holder of the plaintiff's mortgage and an interested party in the Underlying Case. The City, in accordance with state law, had already deposited $490,000 with the Clerk of Court when it filed the Condemnation Petition. (*See* Doc. No. 43-5, Condemnation Petition ¶ 9.) Pursuant to the Drawdown Order, $220,137.59 of that sum was disbursed to Nationstar to pay off in full the plaintiffs' mortgage on the Property. The Drawdown Order also directed that $179,862.41 be disbursed to the Races and that the remaining $90,000 be held in an interest-bearing account pending a final order, again reserving the issue of just compensation for later adjudication. (Doc. No. 43-13 at 2–3.)

According to Gault, he expected, based on his conversations with the Races, that investigating and bringing to light any City corruption that might have existed was to be the focus of his efforts during the "offensive portion of the case," after the "drawdown was settled." (Gault

Dep. 23.) However, on July 30, 2024, the Races terminated Gault's and Bell Carrington's representation. At the time, the full amount of just compensation owed to the Races was still pending. Based on the underlying filings, it appears that the Races retained their current counsel shortly thereafter. (*See* Doc. No. 43-15 at 2 (Order denying plaintiffs'/respondents' Motion for Reconsideration of Agreed Order of Possession).)

In the Underlying Case, the expert appraiser retained by the plaintiffs, Charles M. Smith, MAI, concluded that he was "unable to find sufficient comparable residential, office, retail or business use that would legitimately support a value greater than the $490,000 ($467.56/S.F.) value estimate of the Pipkin Appraisal." (Doc. No. 43-16 at 6.) The City filed a Motion for Summary Judgment in the Underlying Case in February 2026, arguing, based on the plaintiffs' expert's appraisal, that it was undisputed that the fair market value of the Property was $490,000 and that the court should enter judgment in favor of the Races, as respondents, in the total amount of $490,000 and enter a final order resolving the matter. (*See* Doc. No. 43-17.)[6]

The plaintiffs filed the Complaint initiating this lawsuit in December 2024. They allege that the condemnation and taking of their Property was not for a public purpose, because the road at issue was intended only to benefit the campground owned by the mayor and his brother and that any "proper pre-suit investigation" would have revealed as much to the defendants. (Compl. ¶ 25.) They allege that, as a result of the defendants' negligence, they lost their opportunity to challenge the taking of the Property as unconstitutional. The Complaint asserts a single claim for legal malpractice under Tennessee law against all defendants. (*Id.* at 6.)

---

[6] The court has not been informed as to the resolution of that motion or as to whether the case proceeded to trial, as scheduled, on June 30, 2026. (*See* Doc. No. 43-15 at 2 (Order denying plaintiffs'/respondents' Motion for Reconsideration of Agreed Order of Possession, referencing trial date).)

Following discovery, the defendants filed their Motion for Summary Judgment (Doc. No. 43), supporting Memorandum of Law (Doc. No. 44), SUMF (Doc. No. 45), and the evidence cited in the SUMF. The plaintiffs filed their Response in Opposition and, unnecessarily, a separate Memorandum (Doc. Nos. 50, 52), their RSUMF (Doc. No. 51), and additional evidentiary material. The defendants filed a Reply (Doc. No. 53), and the plaintiffs, with permission, filed a Sur-Reply (Doc. No. 56) to address the defendants' contention that some of the defendants' statements in their SUMF should be deemed admitted.[7]

## III.    DISCUSSION

To prove a legal malpractice claim under Tennessee law, a plaintiff must establish that "(1) the attorney owed a duty to the plaintiff; (2) the attorney breached that duty; (3) the plaintiff suffered damages; (4) the breach was the but for cause of the plaintiff's damages; and (5) the breach was the proximate cause of the plaintiff's damages." *In re Blasingame*, 986 F.3d 633, 638 (6th Cir. 2021) (citing *Gibson v. Trant*, 58 S.W.3d 103, 108 (Tenn. 2001)). The plaintiff bears the burden of proof as to each of these elements. *Nelson v. Michael D. Ponce & Assocs.*, No. M2014-01079-COA-R3CV, 2015 WL 867117, at *6 (Tenn. Ct. App. Feb. 26, 2015) (citing *Horton v. Hughes*, 971 S.W.2d 957, 959 (Tenn. Ct. App. 1998)).

As a general rule, "a lawyer's duty arises from an employment relationship with his or her client in which both the lawyer and the client consent to the establishment of an attorney-client relationship." *Austin v. Sneed*, No. M2006-00083-COA-R3CV, 2007 WL 3375335, at *5 (Tenn.

---

[7] The Reply is devoted entirely to arguing that the plaintiffs' Responses to the SUMF do not establish material factual disputes and that the court should deem SUMF ¶¶ 2, 24, 26, and 27 undisputed. The plaintiffs' Sur-Reply addresses this argument. The court has considered the record, and the factual summary set forth above effectively resolves this dispute. The plaintiffs have not pointed to facts in the record establishing a material factual dispute as to SUMF ¶¶ 2 and 24, while SUMF ¶¶ 26 and 27 are neither disputed nor material.

Ct. App. Nov. 13, 2007) (citation omitted). There is no dispute here that an attorney-client relationship was created and that the defendants owed a duty to the plaintiffs.

A lawyer's conduct constitutes a breach of that duty when it falls below the applicable statewide standard for attorneys practicing in Tennessee. *Chapman v. Bearfield*, 207 S.W.3d 736, 739–40 (Tenn. 2006). "When determining whether a lawyer breached a duty, the question becomes whether the lawyer failed to exercise the degree of care, skill, and diligence commonly possessed and exercised by other attorneys practicing in the [state]." *Nelson*, 2015 WL 867117, at *6 (citing Horton, 971 S.W.2d at 959). Expert testimony is required to establish negligence, "unless the alleged malpractice is within the common knowledge of laymen." *Id.* (citation omitted).

A plaintiff in a legal malpractice case has been damaged "when liability has been imposed upon it or when it has lost a legal right, remedy, or interest." *Austin*, 2007 WL 3375335, at *5 (citing *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998)). "When a legal malpractice claim is based on the negligent handling of litigation that results in an adverse judgment or a dismissal of a claim, the plaintiff must prove that it would have prevailed in the underlying action had it not been for the negligent conduct of its lawyer." *Id.* (citing *Shearon v. Seaman*, 198 S.W.3d 209, 214 (Tenn. Ct. App. 2005)). Thus, to prove damages and "but for" causation in a malpractice suit, the plaintiff must "prove that he would have obtained relief in the underlying lawsuit, but for the attorney's malpractice; consequently, the trial of a legal malpractice claim becomes, in effect, a 'trial within a trial.'" *Shearon v. Seaman*, 198 S.W.3d 209, 214 (Tenn. Ct. App. 2005) (quoting *Gibson*, 58 S.W.3d at 108). In the first phase, the plaintiff must prove that the attorney breached the standard of care. If it succeeds at that phase, the plaintiff must then "prove that it had a meritorious claim or remedy that it lost . . . due to its attorney's negligence." *Austin*, 2007 WL 3375335, at *5 (citation omitted).

The defendants move for summary judgment on the grounds that the plaintiffs cannot establish (1) that Gault breached the standard of care; (2) that they would have prevailed on the merits if they had challenged the taking of the Property; or (3) that they incurred recoverable damages as a result of any alleged negligence. The plaintiffs contend that material factual disputes preclude summary judgment. Notably, they argue that their motion to exclude the expert testimony and opinions of the defendants' proffered expert, Kannon Conway, is still pending and that, to the extent the defendants rely on Conway's opinions in support of their position, the court should reject those arguments. The court, however, has considered the plaintiffs' motion to exclude Conway's opinions and will enter an Order denying it contemporaneously with this Memorandum.

## A. Whether the Defendants Breached Their Duty of Care

The plaintiffs contend that there are material factual disputes as to whether Gault breached his duty of care by (1) failing to competently investigate and advise them regarding a viable "right-to-take/public-purpose challenge tied to alleged conflict-of-interest and route-selection/private-benefit facts"; (2) failing to "ensure a meeting of the minds regarding the scope and objectives of the engagement"; and (3) pursuing a "possession-for-drawdown strategy that culminated in an agreed possession order entered without Plaintiffs' informed authorization—-thereby foreclosing Plaintiffs' ability to litigate (or preserve leverage to litigate) the threshold right-to-take phase and accelerating dispossession and demolition." (Doc. No. 52 at 1.)

The facts simply are not sufficient to permit a reasonable jury to believe the plaintiffs' proposed narrative. As set forth above, Mika Race readily admitted during her deposition that Michael Gault told her during their very first telephone conversation that "you cannot fight eminent domain and even if you could, your pockets aren't deep enough." (M. Race Dep. 57.) He asked her to provide any information she could regarding the mayor's conflict of interest and indicated that he would investigate that theory so that they could use evidence of it as "leverage"

to get "a better just compensation" for their Property. (*Id.* at 58.) Although Mika Race purportedly nonetheless believed that Gault would "would fight for [her] property" (*id.* at 58–59), and she and Doug Race both prepared Declarations in which they identically assert that they subjectively "believed" that their attorneys would "evaluate . . . whether the taking itself could be challenged" (Doc. No. 51-8, D. Race Decl. ¶ 56; Doc. No. 51-9, M. Race Decl. ¶ 62), they do not point to any evidence in the record to support those assertions—aside from their acknowledgment that Gault told them up front that they could not fight eminent domain, could not afford to anyway, and that evidence of the mayor's conflict of interest and shady dealings would be used as leverage to get them greater compensation for their Property. Gault's testimony is consistent with Mika Race's recollection, insofar as he testified that he told her that his firm "would only do just compensation" and that he "wanted to make it clear early on that [his] role would be singularly to maximize just compensation." (Gault Dep. 18.) In sum, the plaintiffs' subjective beliefs that Gault would "fight" the taking, which are not supported by anything Gault said or did, are not sufficient to establish that Gault misled them as to the scope of his representation of them.

The plaintiffs also contend that the Contingency Fee Agreement is susceptible of more than one interpretation and, therefore, ambiguous. Determining whether the language of a contract is ambiguous is a question of law for the court. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002); *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 792 (Tenn. Ct. App. 2009). Contract language is ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way. *Lamar*, 313 S.W.3d at 792. A contract is not ambiguous, however, "simply because the parties have different interpretations of its provisions." *Id.* (internal citations omitted). If the terms of the contract are clear and unambiguous,

"the literal meaning of the language controls the outcome of the contract disputes." *Planters Gin*, 78 S.W.3d at 890.

The contract language in this case is not ambiguous. It comprises just over one page and states in its first paragraph that the Races, identified as "Client" in the agreement, request the legal services of Bell Carrington ("Attorney") "for representation in Client's eminent domain/land condemnation matter." (Doc. No. 43-7 at 1.) As set forth above, the scope of the Attorney's services is defined to include "review of the [Condemning] Authority's initial offer, investigation of facts, evaluation of subsequent offers, selecting and retaining appraisers, review of appraisals, compiling records of expenses, and negotiations with [the Condemning Authority's] representative." (*Id.*) Importantly, the Attorney's fee is contingent upon "the final amount procured for the property that exceeds the initial offer of the Condemning Authority." The Client would not owe the Attorney any fee if the "<u>final price obtained for the property is not greater than the initial offer of the Condemning Authority.</u>" (*Id.* (emphasis in original).) The only reasonable inference to be drawn from this language is that the Attorney was engaged to maximize the Client's compensation from the Condemning Authority for the property being taken by eminent domain, not to challenge the taking.

Although the Races deny authorizing entry of the Agreed Order of Possession (*see* D. Race Decl. ¶¶ 68, 69; M. Race Decl. ¶ 68) and claim not to have known about it until months after it was entered, the contemporaneous emails in the record belie those contentions. As set forth above, in an email exchange between the Races and Gault at the end of March 2024, Doug Race "clarifie[d] that the Races' primary concern was ensuring they received just compensation sufficient to cover the substantial debt incurred on the property" and that they were not "attempting to delay the taking for delay's sake." (RSUMF ¶ 14 at 7, 9; Doc. No. 43-10.) And Mika Race

testified that she "of course" knew that the City was taking possession of the Property on May 6, 2024. (M. Race Dep. 87.) Further, the record establishes that Gault emailed Mika Race on May 6, 2024 to inform her that the "Consent Order has been entered" and that they had "30 days to vacate and to remove any personal property." (Doc. No. 43-12.) Mika Race responded, not with confusion as to what that meant or shock to learn that the Consent Order had been entered, but to confirm that they had to vacate within "30 days from today," *i.e.*, from May 6, 2024, and to ask if they could move the shed if they wanted to give it to someone. (*Id.*)[8] The plaintiffs' claim of surprise and lack of authorization is not supported by the factual record, and their attempt to manufacture a factual dispute as to that issue is unavailing.

The court finds, in short, that there is no material factual dispute as to whether Gault breached the duty of care by undertaking to maximize the compensation the plaintiffs would receive from the City and by adequately communicating that strategy to the plaintiffs. He clearly communicated to the plaintiffs the intended scope of representation, to which they agreed by signing the Contingency Fee Agreement, and he did not enter the Agreed Order of Possession without their consent or understanding. This finding, standing alone, requires summary judgment for the defendants. In addition, as discussed below, the court also finds that Gault did not breach a duty of care by declining to advise the Races about, or to pursue, a challenge to the taking, because such a challenge would have been futile.

---

[8] The Conway Report references an April 30, 2024 email that the parties did not file with their summary judgment exhibits, in which Gault told Mika Race that "[o]ur hearing for Possession is coming up on Monday. Still unclear if Michael and I will be attending or doing so by Consent." (Conway Report 3 (quoting BELL_000400).) According to Conway, Mika Race responded saying she thought the hearing was on May 2, but Gault clarified that the hearing on was May 6, and he recommended that she "start working on vacating when possible." (*Id.* (quoting BELL_00400).) Conway also references an email exchange between Doug Race and Gault on May 7 regarding what could and should not be removed from the Property. (*Id.* (citing BELL_000417).)

## B.    Futility of a Takings Challenge

The plaintiffs maintain that Gault breached the standard of care by failing to adequately investigate and to inform them that they had a viable challenge to the taking on the grounds that it did not satisfy the public-purpose doctrine. They allege in the Complaint that the "proposed condemnation did not serve a significant public use" and that the "sole purpose of the unlawful condemnation was for personal financial gain." (Compl. ¶ 20.) Gault himself testified that, if a client wanted to challenge a taking, his typical course of action would be to refer them to a different attorney. (Gault Dep. 16.) With regard to this issue, the defendants assert that raising such a defense in this case would have been futile, and the plaintiffs acknowledge that they can prevail in this case only if they would have had a "viable" takings challenge in the Underlying Case, but for Gault's failure to preserve that claim.

Because the plaintiffs in a legal malpractice action bear the burden of proof on the claim at trial, at the summary judgment stage they must point to specific facts in the record that could lead a rational trier of fact to find in their favor. *Anderson*, 477 U.S. at 248. For the "trial within a trial" portion of their legal malpractice claim, that means that they must point to facts in the record sufficient to permit a rational jury to find in their favor on their takings challenge. In an effort to do so, they plaintiffs point out that even the defendants' expert's "articulation of Tennessee eminent-domain doctrine recognizes judicial deference coupled with exceptions for clear abuse of power and fraudulent, arbitrary, or capricious action." (Doc. No. 52 at 12–13.) Their theory is that "the route selection and impacts on their property were influenced by private interests and irregular processes, and that a thoroughly investigated and litigated right-to-take challenge could have proceeded under those exceptions." (*Id.* at 13.) They assert that there are "disputed project-history facts and disputed inferences about process and motivation" (*id.*), presumably referencing emails suggesting improper processes in finalizing the route for the Westside Connector, but they offer

no legal analysis showing that, even if these purportedly disputed facts were resolved in their favor, their taking challenge would have been successful. Instead, they seek to exclude the testimony of the defendants' expert under Federal Rule of Evidence 702 and Federal Rule of Civil Procedures 37(c)(1). However, as noted, the court will reject their motion to exclude Conway's testimony.

The Sixth Circuit has recognized that "[t]he Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation,' which implies that the power of eminent domain does not permit takings of private property for strictly private uses, regardless of whether just compensation is paid." *Montgomery v. Carter Cnty.*, 226 F.3d 758, 765 (6th Cir. 2000) (first quoting U.S. Const. amend. V; and then citing *Coniston Corp. v. Vill. of Hoffman Ests.*, 844 F.2d 461, 464 (7th Cir. 1988)). However, "all that is required for the taking to be considered for public use is a rational relationship to some 'conceivable public purpose.'" *Id.* (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984)); *see also Am. Tel. & Tel. Co. v. Proffitt*, 903 S.W.2d 309, 313 (Tenn. Ct. App. 1995) ("[W]here the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause." (citations omitted)). "Very few takings will fail to satisfy that standard." *Montgomery*, 226 F.3d at 765–66. As the Sixth Circuit has further observed, "[i]n the overwhelming majority of cases, there will be virtually no chance that the plaintiff will be able to make the extraordinarily difficult showing that a taking had no rational connection to a minimally plausible conception of the public interest. Reasonable plaintiffs should understand this, and are unlikely to run to federal court to press a private-use takings claim on which there is virtually no chance of success." *Id.* at 768.

The defendants have introduced into evidence the Report of their expert, who proffers opinions about the legal framework for the exercise of eminent domain in Tennessee and the

delegation of that power to counties and municipalities in Tennessee. (Doc. No. 43-18, Conway Report 5.) Conway points to a Tennessee statute that expressly recognizes that the "acquisition of any interest in land necessary for a road, highway, bridge, or other structure, facility, or project used for public transportation" is presumptively for a public use. (*Id.* at 6 (quoting Tenn. Code Ann. § 29-17-102(2)).) Conway opines that the Races had "no legitimate basis . . . to challenge the City's power to take the Property," because the Westside Connector is indisputably a public road that meets the statutory definition of "public use" under Tenn. Code Ann. § 29-17-102(2). (Conway Report 7; *see also id.* ("It is hard to imagine a more quintessential public use than a public road for public transportation.").) In addition, according to Conway, under Tennessee law, a governmental body's decision regarding the location of a public road is "within the sound discretion of the legislative body and is conclusive upon the Courts." (*Id.*)

Asked during his deposition about the fact that the City changed the route to avoid going through the campground partially owned by the mayor, Conway reaffirmed his opinion that, although it "may seem unfair," the decision was not a "clear and palpable abuse of power" or "an arbitrary and capricious act." (Doc. No. 54-1 at 63.) Rather, the decision "likely saved taxpayers a lot of money" because of the potential cost of compensating the owners of a "campground that was already platted." (*Id.*)

The plaintiffs' proffered expert on the issue of professional negligence, Michael Richardson, testified that his understanding of the Westside Connector project was that it was a "public road addition" or a "route around Sevierville," and he agreed that a road would be a "public use"—one that would "probably" be "difficult to challenge." (Doc. No. 46-1, Richardson Dep. at 72–73.) He also acknowledged that it is "not the norm" to challenge a taking and that it is difficult to do so successfully "unless you got some good evidence that it's not for public use." (*Id.* at 153.)

The plaintiffs attempt to show that there is a material factual dispute as to whether the Westside Connector is a public road. (*See* RSUMF ¶ 24 ("disput[ing] Defendants' characterization" of the Westside Connector as a "public road").) The plaintiffs, however, expressly acknowledge that the Westside Connector "may be designated as a 'public road.'" (*Id.*) They contend only that there is a material factual dispute as to whether the taking of their Property to construct the public road was for a "*bona fide* public purpose or was instead influenced by private financial interests." (*Id.*) But the fact that the decision of where to place the public road may have been "influenced by private financial interests" is not the test. It is clear that the Westside Connector is a road, and it is open to the public. As set forth above, "all that is required for the taking to be considered for public use is a rational relationship to some 'conceivable public purpose.'" *Montgomery*, 226 F.3d at 765; *Am. Tel. & Tel. Co.*, 903 S.W.2d at 313. Irrespective of whether the placement of the road, in the plaintiffs' view, was to their detriment while benefiting the owners of the campground, they have not presented any evidence from which a rational jury could conclude that the placement of the road has no "rational relationship to some conceivable public purpose."

The evidence in the record viewed in the light most favorable to the plaintiffs—including the "project-history facts and disputed inferences about process and motivation" (Doc. No. 52 at 13)—is simply not sufficient to permit a rational jury to conclude that the plaintiffs could have prevailed in a lawsuit challenging the taking of their Property on the grounds that the taking was not for a public purpose and thus violated their federal (or state) constitutional rights. As a result, the defendants were not negligent for failing to recommend or pursue that course of action. Because such a challenge would have been futile, the plaintiffs cannot show that they suffered damages resulting from the defendants' pursuit of just compensation instead.

## IV. CONCLUSION

For the reasons set forth herein, the defendants are entitled to summary judgment. An appropriate Order granting their motion (Doc. No. 43) is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge